We'll hear argument first this morning in Case 17-2, United States v. Microsoft Corporation. Mr. Dreeben. Mr. Chief Justice, and may it please the Court, Section 2703 of the Stored Communications Act focuses on classically domestic conduct. It requires disclosure in a court order by the United States of information related to United States crime, and here, by a United States service provider. Sotomayor It actually requires a search. It's the disclosure here is really a substitute for the government searching. It the act permits the government to have a warrant and go in and search for these materials or in the alternative to ask the source to do its own search and then turn the materials over. Sotomayor So why you describe it as if it's only a disclosure, but it's really a search. Mr. Dreeben So, Justice Sotomayor, it's a hybrid instrument that has two functions. The first function operates directly on the provider. It requires a provider to make disclosure of information. That is a function that's classically performed by a subpoena or a discovery order. It does not authorize the government to go in, sit down at Microsoft's facilities, put hands on keyboards. Sotomayor Well, actually, it does. If you read the provision, it's an alternative for that, meaning the provision provides for a warrant that presumably would let the government do just that if it chose. Mr. Dreeben So presumably not, because the statute actually says that the government can get a warrant requiring disclosure. The act that occurs in the case is an act on the provider. And the fundamental distinction between a search and a subpoena-type instrument is that in a search, the government does go right in and grab the information. In a subpoena context, the instrument operates on a person, and it places an obligation on that person to make disclosure. Once it gets to the government, once the government has the account in hands, it executes the warrant aspect of the order, which is a probable cause-based order allowing the government to search the account. So it's essentially analogous to if the government knew that an individual had a laptop computer and it wanted to obtain that computer and search it. It could serve a subpoena on the individual requiring the production of the laptop. Once the government gets the laptop into its custody, it needs a search warrant to get in and look at the information. And here, a single order achieves both functions under a statute whose structure and language makes clear that it places disclosure obligations on a provider, and it then authorizes the government to conduct the search. Sotomayor, Mr. Dreeben, may I ask you a broader question? I think the starting point, all would agree, in what was it, 1986, no one ever heard of clouds, this kind of storage didn't exist. And there are good arguments that can be made either way, but a court can say either you are right, all right, or the other side is all right, and there's nothing nuanced about it. If Congress takes a look at this, realizing that much time and innovation has occurred since 1986, it can write a statute that takes account of various interests, and it isn't just all or nothing. So wouldn't it be wiser just to say let's leave things as they are if Congress wants to regulate in this brave new world, it should do it? Dreeben, Justice Ginsburg, a couple of responses. First, I agree that the Court is construing a statute passed in 1986 and then amended subsequently, and we think the Court should leave things as they are with the instrument that Congress authorized operating on a person and requiring that person to produce information regardless of whether it's stored overseas. Microsoft here made a unilateral decision to move information overseas. Nothing in the law requires it. Nothing in the law prohibits it. What Congress did was act against a backdrop of law dating back to this Court's Society Internationale v. Rogers decision in 1958 and running through the Aerospatiale decision in 1987, under which the basic rule of both domestic and international law is that when a court has personal jurisdiction over an individual before the court and issues an order requiring disclosure of information, that person must comply with the order regardless of where it has chosen to store the information over which it has control. In that sense, is it correct to say that the parties agree that the Act does not have an extraterritorial application? Yes, Justice Kennedy. And is that just a concession you make for purposes of this case, or do you read the statute that way? We read it against the backdrop of this Court's decision in Morrison and RJR, which provide that unless the statute clearly has extraterritorial application in its tax structure or operation, it has none. And we're not here arguing that this application is extraterritorial and permissible. What we're saying is that it has always been the rule from decisions in this Court and decisions in the lower court in a basically unbroken line that when a party is before a U.S. court and a court issues an order to that party that says produce information, that's domestic conduct. It's viewed as domestic conduct not only in United States law reflected in this Court's decisions, it's viewed as domestic conduct in international law. But something has to happen abroad. I mean, there are computers in Ireland, and something has to happen to those computers in order to get these e-mails back to the United States. Yes. And this Court has a test for determining whether an application of a statute that has some domestic conduct and some foreign conduct is domestic or extraterritorial. And as Justice Alito put it for the Court in the RJR opinion, one has to look at the focus of the statute. If the focus of the statute has domestic conduct in view, then it is a domestic application of the statute either if, even if, other conduct must occur abroad. Mr. Dreeben, why would that be the case, using the focus test, that we wouldn't take cognizance of the fact that the information must be collected abroad and transmitted from abroad to the United States before it could then be disclosed? I mean, there's a chain of activity that's required here. Why should we divorce the first half from the second? Because I think the way that the Court has to approach this, Justice Gorsuch, is to look at the language of the statute in the actual text and try to identify from that text what is the focus of the statute. Well, I understand that. In disclosure, I understand your argument. Yes. But in order to disclose, it anticipates necessarily certain antecedent conduct. Yes, it does, but you'd ask us to ignore that, I think. Is that your point? Well, I think this Court's case law provides a test that says that if the activity that's within the focus of the statute occurs in the United States, the fact that there may be antecedent or other conduct abroad doesn't detract from a domestic application. And I have an example that I think will help illustrate that point. Suppose that a defendant in Federal court were convicted and ordered to pay a fine. And the defendant said, I can't do that with my domestic assets. They're all located abroad. I am fairly confident that the courts would say the obligation falls on you, how you raise the money is your concern. It's not an extraterritorial application of the statute to say bring the money home and pay the fine. And that's the same that we're asking to happen with the warrant. In fact, the text of the statute says nothing about extraterritorial conduct. Sotomayor, I don't know that you fairly answered Justice Ginsburg's question. This is a 1986 statute. The reality in 1986, if you look at the statute and its reference to stored records, to stored communications, was a past technology old concept. But I think it's fair to say that back then they were thinking that where these communications were stored, they were in existence in the United States, not abroad or nowhere else, and that they were protecting the communications that were stored in particular locations. Things have changed, but what you're asking us to do is to imagine what Congress would have done or intended in a totally different situation today. And the problem that Justice Ginsburg alludes to is the fact that by doing so, we are trenching on the very thing that our extraterritoriality doesn't want to do, what our jurisprudence doesn't want to do, which is to create intranational problems. Now, I understand there's a bill that's being proposed by bipartisan senators that would give you most of what you want, but with great protections against foreign conflicts. There are limitations involving records that are stored abroad. Why shouldn't we leave the status quo as it is and let Congress pass a bill in this new age that addresses the potential problems that your reading would create? So I've got to start with the last part of your question and then come back to the first, because otherwise I'll probably forget what the last part is. There is not an international problem here. This is largely a mirage that Microsoft is seeking to create. For the 20 or so — Sotomayor, I'm just wondering about how this would conflict with so much foreign law. We've got a bunch of amici briefs telling us how much this conflicts. No foreign government has come to this Court saying that the order that we seek would conflict with its law. The State Department and the Office of International Affairs and the Justice Department have heard no complaints from foreign governments about the way that we have typically operated under 2703 for decades. In fact, the complaints all run the other way. The complaints are that when foreign governments need information from U.S. providers, they come here under a mutual legal assistance treaty, an MLAT, and they depend on the United States, pursuant to a statute, to go into court, invoke 35 — 2703, and seek the information from the provider wherever it may be located. And the Microsoft decision has caused grave interference with our ability to help our foreign law enforcement partners enforce their own laws. It is — the Microsoft decision also puts us out of compliance with our international obligations. The Budapest Cybercrime Treaty, which is joined by over 50 nations, including most of the European nations, requires courts in — in particular jurisdictions to have the authority to require providers to furnish information in response to court requests, regardless of where the information is stored. That's Section 18.1a of the Budapest Convention. So the international baseline here is exactly what the government is arguing for. And we are the ones who are really urging the status quo. Sotomayor, because there's been a lot of back and forth, and I — I tend to disagree. There's an open question on the Budapest Treaty. But putting that disagreement aside, assuming the point I've made, there is a bill. Can you tell me where it is in the legislative process? It's bipartisan. It's supported by the Department of State and the Department of Justice. It does deal with certain rights and limitations to the access to this information when it's stored in foreign locations. Why shouldn't we wait for that bill? Well, first of all, this Court's duty is to interpret the statute under its own statutory interpretation — interpretation canons. I don't think the pen — There's no circuit split. We granted cert before a circuit split, which is an unusual act to start with. Well, there are a couple of reasons for that. No other court that has issued a written opinion since Microsoft has agreed with the Second Circuit. And the Second Circuit's decision has caused grave and immediate harm to the government's ability to enforce Federal criminal law. But as to the question about the CLOUD Act, as it's called, it has been introduced. It's not been marked up by any committee. It has not been voted on by any committee. And it certainly has not yet been enacted into law. And I think this Court's normal practice is to decide cases before it based on the law as it exists, rather than waiting for an uncertain legislative process. And as to the — If I could just make one final point on this. As to the bill itself, it does not retrench on the authority that the government says is part of the legal fabric here today. It actually endorses in an unqualified manner the government's ability to get information from a provider over whom it has jurisdiction, regardless of the location of the data. It goes on to provide very useful mechanisms for bilateral cooperation that will facilitate other nations' ability to get information from our providers and our ability to get information from their providers with safeguards. But those are supplementary protections that do not exist apart from the fundamental 2703 obligation, which I would add does have built-in protections to address Justice Ginsburg's concerns. Lower courts have confronted this problem in a variety of other contexts. This is not a new problem. In the banking area, the government has been very active in putting subpoenas on branch offices of foreign banks that have access to the — Mr. Dreeben, you use the word subpoena, and we've talked about that a lot. And could you help me out with the fact that when we're focusing on the text, here the statute uses the word warrant, which typically has a very limited and narrow understanding territorially, unlike subpoenas. Yes. And elsewhere in the statute, Congress used the word subpoenas. Yes. So we know it knew the difference. Yes. Help me out with that. Okay. So I'm glad that you brought up the text, because I think the text is actually the government's friend here. What the statute does is create obligations of disclosure. It puts an obligation on a provider to make disclosure. What a warrant does, if it's in its ordinary form under Rule 41 of the Federal Rules of Criminal Procedure, apart from this statute, a warrant is an authorization to a law enforcement officer to go in and search. It doesn't need the cooperation of anybody. It doesn't put the obligations to do anything on anybody else. It puts the government in the driver's seat. This statute says that it uses the word warrant. So what are we supposed to make of that? I think what you make of it is that the structure of the statute provides three mechanisms for the government to obtain disclosure, a subpoena, a 2703D order, which is the intermediate form of process that's at issue in the Carpenter case, and a warrant. And those three different instruments correlate with the different levels of sensitivity of information that Congress perceived, and therefore, it ratcheted up the showing that the government had to make in order to get the disclosure order. And so instead of saying just go get a warrant, it says get a warrant using the procedures of Rule 41, not all of Rule 41. The territorial limitations of Rule 41 are not incorporated into the statute. In fact, the statute has its own territorial provision, which provides for nationwide service of disclosure orders. And it goes on to specify that this disclosure obligation applies regardless of the instrument, be it subpoena, 2703, or warrant. It all falls on the provider to make disclosure. And I think that that's an important fact, because when you have an order to a provider, it allows the provider to do what my friend here did, come into court and make an ex before the instrument is executed. With a warrant, parties don't get that opportunity. Under United States v. Grubbs, government shows up with a warrant. The citizen's obligation is to comply. It also ensures that the recipient has the obligation to raise various objections about burdensomeness, which are also features associated with subpoenas, not warrants.  A warrant allows the government to just come right in. If we had a warrant, and we could get a Rule 41 ordinary warrant if we wanted to, we would go to Microsoft headquarters and ask the gentleman sitting at the keyboard to step aside and sit down and do the work ourselves. But we don't do that under 2703, and Congress didn't intend that we do that. What Congress intended was that we have the ability to compel providers to provide information. And the warrant then addresses the customer's privacy interests. So the court below thought that two things were going on. One was we were actually executing a warrant overseas. That's not true. We're putting an obligation on a domestic provider to comply with a domestic court order with information from wherever it's drawn. And second, the court below thought that we were invading privacy overseas. There are two fallacies, I think, in the view that this is a case about privacy. It's not a case about privacy. The government has the gold standard of an instrument to address privacy interests here. A probable cause-based warrant issued by a judge that describes with particularity what we want. That is the hallmark in our domestic system of how privacy interests are addressed. Breyer, I don't know if you want to do that. Alito, do you think there's anything that the Stored Communications Act prevents you from obtaining this information in either of the two conventional ways that you mentioned? One, by getting a grand jury subpoena. If the Stored Communications Act simply doesn't apply here, could you go to a grand jury and get a grand jury subpoena? Or two, conduct the kind of search that you just referred to. And if you did that, would Microsoft have any opportunity to contest that search? So if we got an ordinary conventional warrant under Rule 41, Microsoft does not have an ex ante opportunity to contest the search. The government goes in and it takes control of what property it needs to in order to conduct the search. The grand jury subpoena, I think, is a little bit of a more difficult question, because the question would be whether 2703 meant to occupy the field in getting information from providers, or instead left us free to use grand jury subpoenas in areas that aren't covered by 2703. What is clear, I think, though, is that 2703 was meant to build on categories of existing instruments, plus adding a new one of Congress's own device. The subpoena instrument is useful for us in certain circumstances for the content of information under the way that Congress wrote the statute, if we give notice to the person whose privacy interests are implicated. It also allows us to get very basic subscriber information. We don't have to go to a court first. We just issue the instrument. The provider has to make disclosures. Should I ask you one other question? What is happening when these orders are sought now outside of the Second Circuit? I mean, there's been talk about leaving things alone, but is the rest of the country going, are the judges everywhere in the country going to follow what the Second Circuit decided? Are they doing that, or are they continuing to issue the kinds of orders that were issued in the past? Every district court that has written an opinion outside of the Second Circuit has rejected the Second Circuit's approach, and the United States is continuing to compel information from service providers, regardless of where they store it. And in the case of providers like Google, algorithms enable them to move information around the globe in order to maximize the efficiency of their system, and much of the information that we're getting is coming from overseas. And we have heard no protests from foreign governments. And what is happening when these district courts outside of the Second Circuit are issuing these orders? The Internet service providers are not appealing? I think that in some cases, there are appeals that are on hold pending this Court's disposition of this issue, so it's not going to go away. And if Congress doesn't enact legislation, we will be here in the exact position we are today, stymied in the Second Circuit, but getting the exact same information from providers all over the country and the rest of the country, and it's information that's extremely vital to criminal law enforcement, because so much criminal law enforcement today is international. Breyer. I see the problem, I think. But what I don't see yet, maybe I just have to go back and study it, is your answer to Justice Gorsuch's question, which has been bothering me on both sides. They are with you on this, you know. But I look at the language of the statute, and the statute says, A government entity may require the disclosure by a provider of electronic communication only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure. Right? That's what it says. So then I go to the Federal Rules of Criminal Procedure, and there, the first thing I discover is you ask a magistrate, and it says, A magistrate judge with authority in the district has authority to issue a warrant to search for and seize a person or property located within the district. All right? Now, so that's what you did. You went to this person, a magistrate, I think. Dreeben. No, that's not what we did. You went to the district judge. We went to the district court. But it's the same problem. It's the same. Isn't it? Well, it's a slightly different problem, Justice Breyer, and I think that I can help clear up a little bit of this. There are two angles of it. The most basic one is that the Stored Communications Act itself has a jurisdictional provision that allows the government to go to a variety of places to get warrants. It can go to the district where the crime is being investigated, and that court has nationwide authority. It's not trammeled by Rule 41. But is that what you did? What did you do here? We did that here. We did that here. This is an investigation being conducted out of one district. Okay. Second question is maybe it's not this case. But what happens if you go to Microsoft and you ask, say, for some bank records that are in Italy, and in fact, Italy does have a law, we imagine, which says absolutely no bank record can be taken by any other person without some special thing under the MLAT or something? Yes. And what happens then? So this is a very common problem, and it's why I've been here. All right. So what is the answer? The answer is that courts conduct a comedy analysis. They look to the restatement of foreign relations. Okay. So the answer is that, which many of my key suggests to us, that what should be done in such a case is you go to the magistrate or the judge and you say, judge, I want you to look at the factors of comedy. And one of them will be if there is, which you say is not here. Yes. This Italian law, if there is, which says you can't bring it. Yes. So you, so perhaps there is agreement, we'll see, about what should be done. And this new law proposes that. Well, I think what's more radical is that Microsoft's position is that no court ever gets to ask the question. If the data is stored overseas, we're just out of luck. We can't even ask a court for an order that would require its production. They haven't asserted that it would violate foreign law in order for them to comply with the order that we obtained in this case. Nobody has actually pointed concretely to a foreign law. So you're saying, Mr. Dreeben, that a court in that circumstance should conduct a comedy analysis? Yes. And if you are, what would that look like and when would it occur? Well, in our view, it would occur at the contempt stage, after the government procures an order if it seeks to impose sanctions on a party for noncompliance. That's roughly the model that this court used in Society Internationale v. Rogers, a 1958 decision that squarely posed the question of whether a party over whom a U.S. court had jurisdiction could be ordered to produce documents that were located in Switzerland when Swiss law had a blocking statute. And the court had no problem with the issuance of the order, but it had a great deal of problem with failure to conduct any comedy analysis that took into account possible conflicts with foreign law. And that same framework was applied by lower courts when they encountered grand jury subpoenas, seeking financial information located in foreign states, and there was an assertion of a conflict with foreign law. So there's nothing new about this problem. It's a problem that courts have been grappling with for decades quite successfully. And what's more remarkable is it's never come up under the Stored Communications Act. We have had no protests either before or after Microsoft, and no litigation by a party either before or after Microsoft that said this order would violate foreign law. Kagan. May I take you back to the language of the statute? Most of your argument in your brief focuses on 2703. And you say we should just focus on 2703. And I'm not going to argue with you one way or the other on that, but I want to get your view, actually, of what the focus of 2701 and 2702 is. So if you do expand your field of vision and, you know, what would you say there So 2701 is a statute that blocks access. It's a protection against hackers. And we think that is a domestically focused statute, but it would reach foreign conduct that hacked into a computer located in the United States. The computer is here, but the hacker is overseas. Yes, yes, because the conduct that's the focus of 2701 would be here. 2702 is a much more difficult statute. We have not taken a position in this Court on its focus. It prohibits certain divulgences of information by providers. We've been willing to assume for purposes of this case that its focus mirrors 2703 and addresses only domestic disclosures. But that only puts us in the same position as Microsoft with one difference. Microsoft's theory is that if it moves information abroad, since storage is the only thing that counts, it's then free to disclose that information to the world, to sell it, to do anything it wants free from U.S. law. The only thing that Microsoft adds to that picture is that the only person who can't get it is the United States under lawful process. And we think that that's wrong and that the Court should reverse that judgment. If I could save the rest of my time for rebuttal.  Roberts. Mr. Rosenkranz. Rosenkranz. Mr. Chief Justice, and may it please the Court, I'll start where Justice Kennedy started, which is where we all agree, that the Stored Communications Act is limited to the United States, yet the government wants to use the act to unilaterally reach into a foreign land to search for, copy, and import private customer correspondence physically stored in a digital lockbox in a foreign computer where it's protected by foreign law. Now, that is a foreign scenario, not a don't do it.  I would like to make a point, and you can hold him and correct me if it's incorrect, that until this very case, Microsoft was complying with these disclosure orders. In this case, it's the first time it objected, but there were past efforts of the same kind, and Microsoft disclosed the contents of the communications. Is that so? Yes, Your Honor, but just I want to make sure that you – that the Court understands, Justice Ginsburg, that this is a very new phenomenon, this whole notion of cloud storage in another country. We didn't start doing it until 2010. So the fact that we analyzed what our legal obligations were and realized, wait a minute, this is actually an extraterritorial act that is unauthorized by the U.S. Government, the fact that we were sober-minded about it shouldn't be held against us. Roberts. Well, but it's – it seems to me you're assuming the answer to the question. The government's position, of course, is it's not an extraterritorial act. They're going to Redmond, Washington, and saying you have to turn this over to us. It's not the government's fault that it's located overseas. I suspect the government doesn't care. Just like any other subpoena where you go and Mr. Dreeben used the example of funds, but it could be any other evidence. And if there is a particular objection by the government where the information is located, they're free to raise that and the government will have to deal with that, but I gather that's not the situation here. Well, Your Honor, first, it is the situation here, but let me answer the question directly. The reason that this is an extraterritorial act goes right to the heart of why we have a presumption against extraterritoriality. No one disputes that countries across the world believe that they have the sovereignty and the sovereign right to pass their own laws governing the access to e-mails stored on their soil. And here we are, reaching into their lands and imposing our U.S. position on who gets access to e-mails on their soil. Kennedy, why should we have a binary choice between a focus on the location of the data and the location of the disclosure? Aren't there some other factors, where the owner of the e-mail lives or where the service provider has its headquarters? No, Justice Sotomayor, we're forced to this binary choice? Your Honor, that is a consequence of this Court's analysis in Morrison, which no one is challenging. But so, yes, you've got to figure out what the focus is at step two. No one's arguing for any focus other than the government's argument that it focuses on disclosure and our argument that it focuses on storage. And I want to be sure to get to that argument. If you look at this statute, the focus is on the disclosure of the data. It's not on the storage. This is the Stored Communications Act. At the most basic level, that's what the focus is. And it's more specifically on securing communications sitting in storage. Congress confronted this brave new world of people entrusting their communications to third-party storage providers. It wanted to make sure that Americans felt comfortable putting their communications there. Mr. Rosenkranz, this is what troubles me. It would be good if Congress enacted legislation that modernized this, but in the interim, something has to be done. So what happens in this situation? There's an American citizen who's being investigated for crimes committed in the United States. The government shows probable cause that there is evidence of this crime in e-mails. That are in the possession of an American internet service provider. And they have an urgent need for the information. But the provider has chosen to store the data overseas. And in fact, in some instances, has actually broken it up into shards so that it's stored not just in one foreign country, but in a number of foreign countries. Now, what happens in that situation? There is no way in which the information can be obtained except by pursuing MLATs against multiple countries, a process that could – that will take many months, maybe years. What happens? Rosenkranz, Well, Justice Alito, first, that is not, so far as – certainly so far as this record is concerned, and not so far as any record before any court is concerned, what actually happens. No one actually breaks up the e-mail into shards, certainly not in this case. That's not what Microsoft does. And that is not, it turns out, what Google does either – excuse me. That is not what the other service provider does either in the context of these other cases that are being – Alito Well, we were told that that's what Gmail does. That's not correct? Rosenkranz No, Your Honor. That's not correct. Alito All right. Well, all right. The service provider has chosen to store it overseas. There's no way to get the information other than through these very time-consuming MLAT procedures. Rosenkranz Well, Your Honor, the way to get the information is through MLATs. And the only evidence in this record about MLATs is that MLATs do work. If it's urgent for the government, the other governments respond urgently. Breyer Just – there are two parts to this in my mind. One is the language which I'll have to work my way through. You heard the answer to that. The other is a practical way of dealing with the foreign law. Now, the government suggested – and what's impractical about this – in any situation where, say, Microsoft thinks that there really is a problem here because of a foreign law, which might forbid it for a variety of reasons, what you do is you – Microsoft goes to the magistrate and says, look, there's a problem here because of the law of other countries, because of this, because of that. And the magistrate takes that into account. That sounds to me like a – and then maybe Congress will pass this and we'll have standards in it and it'll be much more helpful. But even without that, what's wrong with that? The problem with that, Justice Breyer, is that that's not the statute Congress passed. The statute Congress passed is a statute that does not call for this sort of way of dealing. Breyer You're giving a conceptual answer, which I think is fine. But I want to know, if the language permits it, can we read this statute to adapt to the modern condition? And if we can, then shouldn't we do it that way? Because it would be practical, everybody would get a fair shot, you'd take foreign interests into account, maybe you'd use aerospatial standards. One brief tells us they're not good enough, but it didn't say what we should use. But the – you see my question? I do understand your question, Justice Breyer. And the answer is that is simply not the statute that Congress wrote, and the job of this Court is to interpret the statute Congress wrote, rather than innovating and adopting its own new standard. Now, by the way, the Cloud Act that has gotten some conversation this morning does have various factors that might be weighed. That's Congress's decision, if Congress wants to do that, and it's a decision that applies in circumstances. Kennedy, under this Act, could you voluntarily disclose this to the government, or would that be a violation of 2702? It would not be a violation of 2702 if we voluntarily did something, but it would be a violation of our obligations to our customers. Well, if that's so, then why can't the government just obtain this by subpoena? Well, so that is another big question. This is a statute in which the – or a scenario in which the government has used a warrant. A subpoena could not reach a lot of these e-mails, because a subpoena would not reach e-mails that are in storage for less than 180 days under this statute. And under a Sixth Circuit decision, couldn't reach them at all, that is, individuals private. Kennedy, you could voluntarily disclose that they couldn't have a subpoena. I'm sorry. It seems odd to me that if you could voluntarily disclose, but they couldn't ask for a subpoena. That doesn't quite mesh, does it? Well, Your Honor, my point is – I recognize we have a difficult statute here. Your Honor, if we voluntarily disclosed, it would be a violation of our obligations to our customer. It would also, by the way, in this context, be a violation of European law. No, I just – I want to back up, though. There are a lot of – Mr. Rosenkranz, do you agree that after 180 days, the government could get this material with a subpoena? Absolutely not, Your Honor. That is – I agree with you that that is what the statute says, but it raises the same exact problems of extraterritoriality, because, I mean, the only thing that we wouldn't be able to do is rely on the word warrant and all of the territorial implications of that word, but all of our other answers would be the same. The truth is, other countries – What actions would Microsoft have to take extraterritorially to comply with the – in this case, the warrant? What would Microsoft have to do outside the United States? Well, so let's start with the fact that these e-mails are stored outside the United States. They are stored in Ireland, and the government is asking us to go and fetch them from Ireland. They are subject to protections in Ireland. So what happens in Ireland? What happens in Ireland is really a remote control is actually working a mechanism where these e-mails are stored on a hard drive in a facility under protection of foreign law, and a reader, which is a physical piece of hardware, reads the digital ones and zeros off of it, which are also physical manifestations. It's then packaged up, and it runs through Ireland on hard wires and over the Atlantic. This is a quintessentially extraterritorial act. Now, I was just saying, there are a lot of complicated questions in this case, but the decisive point and the point that Justice Gorsuch was making earlier is that the e-mails are stored in Ireland, and the DEA is forcing us to fetch them. Sotomayor I'm sorry. I don't – perhaps it's my technological ignorance. How is it in a lockbox? If I'm trying to mentally imagine this, what has to happen, you know, I press a button in the U.S. and it accesses directly the information in Ireland, or does something have to happen in Ireland? Something has to happen in Ireland. These e-mails, Justice Sotomayor, exist only in Ireland. And what happens – and it exists in a – Something has to happen electronically or with a human intervention? No, no human intervention. There's a human – You push the button in Washington. Yes. Then obviously something happens in Ireland on the computer, but does some person have to be there? A human being doesn't have to do it. It is a robot. And if you sent a robot into a foreign land to seize evidence, it would certainly implicate foreign interests. And so if the DEA – just let me just draw out this example. I'm sorry. I'm now – I guess my imagination is running wild. How does – who tells the robot what to do and what does the robot do? A human being in, let's say, Redmond, tells the robot – sends the robot instructions. And by the way, the computer scientist, Amicus Brief, spells this out in great detail. What happens then? It interfaces with a hardware computer in a hardware facility. It spins a disk. It looks for the e-mail on that disk after verifying certain protocols. It reads physical manifestations on magnets of the ones and zeroes, which are like letters in the alphabet, and then it copies them onto another disk. It then safeguards them and sends them back here. Now, if the DEA sat at a computer in D.C. and hacked into our servers in Ireland, everyone agrees that that would be a search and seizure in Ireland. If the government did what Mr. Dreeben described, executed a search warrant itself, pushed us aside from the operator in Redmond, pushed them aside and said, I'll take it from here, that search would be in Ireland. All that's happening now is that the government is requiring us to do something that it would want to do. Roberts. Do you dispute that the government could issue a warrant to go ahead and do exactly that in Redmond? The government could issue a warrant. I believe that's putting it aside and do the search in Redmond. This warrant authorizes it. There's nothing. Could the government do that outside of the Stored Communications Act? Could the government issue a classic search warrant, go in to Redmond and conduct the search on the computers in Redmond? It would be an extraterritorial search. It would therefore be illegal. But if the government did that, there's no question that that search is going on in Ireland, and the government. And what could you do about it? We could sue the government and say that you can't come onto our property and engage in these unconstitutional, in these extraterritorial acts. But my point here, Counsel. What kind of a suit would that be? But anyway, never mind. There is nothing under your position that prevents Microsoft from storing United States communications, every one of them, either in Canada or Mexico or anywhere else, and then telling their customers, don't worry, if the government wants to get access to your communications, they won't be able to unless they go through this MLAT procedure, which is costly and time-consuming. Could you provide that service to your customers? Is it theoretically possible? Yes. But it would never happen. And the reason it would never happen is that we have 200 million active customers here in the United States. This is really a tail ---- I'm sorry. In what way is their service seriously compromised if the server is overseas? Well, there is a basic physical property at issue here that underscores that this is not just some random act of putting e-mails in one place or another. There is this physical phenomenon called latency. It actually slows down the e-mail service for those 200 ---- Okay. So you ---- so they have to wait a little longer, I assume quite a short while longer, but they are protected from any government intrusion into their e-mail communications. Your Honor, these facilities are half a billion dollar facilities. We build them in order to make sure that our customers get the best possible service. Even a microsecond ---- even a fraction of a second's delay actually costs us customers. And so we would ---- Well, but you might gain customers if you can assure them, no matter what happens, the government won't be able to get access to their e-mails. Your Honor, so this is the tail wagging the dog problem. We have 200 million customers who are relying on the best service here in the United States that can possibly be brought. The government serves on a, say, I mean, these statistics are public, 60,000 requests for information in the United States. The percentage of those that relate to e-mails abroad, it's 54 of them out of 60,000. It's 99.9 ---- But my basic point, and I'm not sure that you've answered it, is that there is nothing that prevents Microsoft. In other words, an e-mail from me to somebody in the other side of the building that is going to be stored somewhere else would be protected from disclosure if people in the government wanted access in the normal course of a criminal investigation where they have a warrant establishing probable cause. From here to the next block, that is going to be protected from disclosure to the government. And, Your Honor, my answer is an equally practical one, and that is if customers do not want their e-mails to be seized by the government, they don't use Microsoft services. They don't use Microsoft services, whether they are in Canada or Mexico, because those are available by MLATs. What do they do? They use services that are sold specifically with the promise that we have no U.S. presence, and therefore, you can trust us to keep it under lock and key from the U.S. government. By the way, you probably all have cell phones with this feature. It is a feature that scrambles your instant messaging and that scrambles it in a way that no government can get their hands on it. So it's not like this is a device that is available only through Microsoft services. If people want to break the law and put their e-mails outside the reach of the U.S. government, they simply wouldn't use Microsoft. Alito, is it correct that we don't know the nationality of the individual who has this e-mail account? Yes, that is correct, Justice Alito. Well, if this person is not Irish and Ireland played no part in your decision to store the information there and there's nothing that Ireland could do about it if you chose tomorrow to move it someplace else, it is a little difficult for me to see what Ireland's interest is in this. Your Honor, Ireland's interests are the same interest of any sovereign who protects information stored within their domain. We protect information stored within the United States, and we don't actually care whose information it is because we have laws that guard the information for everyone. And I guess the point is, when we're talking about this information, which, all right, yes, it physically exists on one or more computers somewhere, but it doesn't have a presence anyplace in the sense that a physical object has a presence someplace. And the Internet service providers can put it anywhere they want and move it around at will. The whole idea of territoriality is strained. Wouldn't you agree with that? I would not agree with that, Justice Alito. And here's why. First, I disagree with the premise. This — these e-mails have a physical presence. They are actually on a hard drive. Are they movable? Yes. But letters are movable as well, and they are under protection of foreign laws, which, by the way, are really quite robust. So moving — moving just back to the — to the basic question of focus, the common thread that ties together all of these cross-reference provisions of the SCA, the common thread is stored communications that are in electronic storage. That is what ties these provisions together, and that is the focus of the work of SCA. Kagan. Kagan. Well, why do we need to look for a common thread? Why shouldn't we just look at 2703 and ask what Congress was trying to do in that section? Well, Your Honor, even if you focus on 2703 and isolate it from everything else, the first thing I'd say is even the government agrees that that's not what you're supposed to do. You are, at a minimum, allowed to look at how it relates to other provisions. The focus is still on protecting e-mails in electronic storage from government  It is not about the other provisions. Well, how do we know, really? I mean, it seems as though we have a choice between two things. One is what Congress is doing is it's regulating the disclosure in the United States of electronic communications that are stored everywhere in the world. And that's what the government is saying. And you're essentially saying the opposite. What Congress was doing was to regulate the disclosure anywhere in the world of electronic communications that are stored in the United States. I'm not sure how I pick between those two from the face of the statute, whether it's 2703 or whether it's the broader statute. So give me your best shot. Okay. So I'll give you, if I may, I'll give you a couple of shots. If we're only focusing on 2703, Congress passed the 2703 because it wanted to limit law enforcement access to a specific category of e-mails. And that is what? E-mails that are in electronic storage. Congress was concerned that e-mails shared with a service provider would lose all Fourth Amendment protection under the third-party doctrine. Congress did not need to pass 2703 to author disclosure by a warrant. Law enforcement already had access by a warrant. The focus was on enhancing the security of e-mails that were in electronic storage. Now, back up and relate the various provisions, 2701, 2702, 2703. I was saying earlier at the most basic level, this is the Stored Communications Act. It's about securing communications that are sitting in storage. I was describing earlier this brave new world that Congress was facing where it wanted people to understand that their e-mails in electronic storage were safe. If I – but you focus on the storage. 2703 is headed, required disclosure of customer communications or records. And Congress put that heading in the Act when it amended it. And it seems to me that the government might have a strong position there that the statute focuses on disclosure, and disclosure takes place in Washington, not in Ireland. Well, Your Honor, 2703, this goes back to Justice Kagan's question. It cannot be read in isolation from 2702. 2701 and 2702 are with 2703. 2702 says voluntary disclosure of customer communications or records. And that, too, takes place in Washington, not Ireland. And so the answer, Your Honor, is that the Act was first and fundamentally about protecting the communications that were in electronic storage. And so 2703 pairs with 2702. Now, 2702 is about making sure – so 2702, as the government has said, is about making sure that the electronic communications in electronic storage are protected. And 2703 is simply an exception to 2702. Breyer, I'm going to ask a technical thing to help me with that. Do it no more than 15 seconds. What I did is I looked at the warrant, which is in the record, and it's signed by James Francis Magistrate Judge, Southern District, New York. Is that right? Yes, Your Honor. Okay. So then I went over to the Rule 41, and I assumed it fell within B, A, or what is it? It's B, 1. Am I right, or is it – do you know that well enough in your head? Yes, Your Honor. Let me hear the question again. Well, if it fell within B, 1, it says that Mr. Francis, Judge Francis, has authority to issue a warrant, to search for and seize a property located within the district. So that's how I got into my linguistic problem. What's the answer? Well, Your Honor, the government has invoked 2703A, which is the provision that we're talking about. So I said, what's the warrant? It's Judge Francis's warrant. He's in the Southern District of New York. I went to Rule 41, and there are 41B, 1. Oh, Rule 41, yes. Yeah. So what's the answer to that? The answer says that Judge – this says that Judge Francis has authority to issue a warrant to search for property in New York. I agree with you, Justice Breyer, and warrants are distinctly territorial devices. They're not extra-territorial devices. So if we're looking at Federal rules, I think the question is that they're not extra- territorial. Breyer, you didn't make much of a point of this in your brief, and so I suspect that it just can't be that easy, this case. No, Justice Breyer. I think we certainly tried to make a point in our brief that this incorporates I think the question is this. If this information were in Redmond, Washington, would the magistrate judge be unable to issue the order because Redmond, Washington, is not in New York? That's the question. That's right. Oh, he would not be able to issue the warrant, and it's not because Redmond, Washington, is not in New York. It's because warrants, although there is nationwide ability to reach evidence within the United States, warrants are not extra-territorial. Now, just by way of wrapping up, the government asks this Court to grant it an extraordinary power, and it's a power that Congress did not think it was granting law enforcement in 1986, and certainly did not intend to grant to every police officer and every sheriff's deputy anywhere in the country. Back then, if the police needed to gather evidence from all over the world, they would have to engage with law enforcement everywhere else in those countries. The Internet makes it possible now to reach a lifetime of correspondence for billions of people all across the world, but only Congress can grant that power. And this goes to Justice Ginsburg's point. Think about the questions that the Court has been wrestling with today. It's about the architecture of other providers. It's the conversations about where the Internet is headed. There's conversations about whether this will kill the tech sector. How much of an international consensus there is about the sovereignty of data. These are all questions that only Congress can answer. Meanwhile, this Court's job is to defer, to defer to Congress to take the path that is least likely to create international tensions. And if you try to tinker with this without the tools that only Congress has, you are as likely to break the cloud as you are to fix it. If there are no further questions, I thank the Court for its attention. We respectfully request that the Court affirm the Second Circuit. Roberts. Roberts. Thank you, counsel. Two minutes, Mr. Dreeben. Dreeben. I have four quick points, two technical and two substantive. The technical point first is, Justice Breyer, you asked what the authority of the district court is. The authority of the district court in this case for a magistrate judge comes from, first, 2703, which entitles a court of competent jurisdiction to issue the relevant warrant in this case. This is on page 6A of the government's appendix to its brief. There is then a definition of a court of competent jurisdiction on page 12A of the appendix to the government's brief, which defines it to include any magistrate judge that has jurisdiction over the offense being investigated, as well as several other bases. This was a Patriot Act amendment designed to expand the authority of courts to issue orders. The second technical question is the one asked by Justice Kennedy on whether Microsoft could voluntarily disclose this information to the government. It couldn't. It's barred by 2702 from making disclosures except as authorized by that statute, and one of the exceptions is that the government can proceed under 2703 to compel the same information.  And then the substantive points here are that this statute does indeed focus on disclosure, not storage. 2703 begins by requiring disclosure as to the variety of categories of information that providers may have, and it backs it up with at least three more provisions that address the need for disclosure. Section E says there's no cause of action for disclosing in accordance with the statute. Section F allows the government to issue preservation orders of the information to be disclosed. And Section G discusses the execution of the warrant, and it provides that the government need not be there, which makes this an instrument not like a warrant that allows us to conduct a search, but like a subpoena or discovery order that places obligations on parties over whom the court has jurisdiction. Thank you. Roberts.